Our second case for this morning is Sherry Anicich v. Home Depot. Ms. Barnett. May it please the Court. Good morning, Your Honors. My name is Kristen Barnett. I am here on behalf of Sherry Anicich as Independent Administrator of the estate of baby Ava Lucille, the plaintiff's appellant. This case involves a young lady, Alicia Bromfield, and her unborn baby, Ava Lucille. Believe me, we know everything. If you wrote it in your briefs, we know it. We know it. Thank you, Your Honor. Had Mr. Cooper ever been physically violent with a female employee or threatened an employee with physical harm? I mean, I understand all of the disgusting sexual harassment and the throwing of objects and what seems to be a violent temper, but had he ever been physically violent with a female employee? Judge, I would submit that a throwing of an object is a physically threatening and violent action. To scream obscenities at a 7-month pregnant 21-year-old is threatening, and that I would submit that coercing a 7-month 21-year-old college student to go somewhere under the auspices that she will lose her job or have her hours reduced is threatening, especially given the history of him swearing at her. You know the words that he said, I believe, and I would submit to you that sexual harassment is inherently threatening. Am I remembering the record correctly that the earlier young woman, Jessica, alleged that he rubbed himself up against her? That is correct, Your Honor. So there was a physical, offensive physical contact. There was, and she also complained to her supervisor at the store that I believe was Joliet Home Depot about that incident and that she was having problems with him. Could I ask you, you have some pretty detailed allegations about the scene of the murder. I take it those are from Mr. Cooper's confession? Mr. Cooper sat for two criminal trials, and I was able to get his testimony from those trials. He testified in both of them? That is correct, and that is the only information that I have to go from based off of, since there was no discovery at this juncture. Okay. Can I ask also, is there any issue under Illinois law here with respect to workers' compensation as a bar to any tort claims? Your Honor, I do not believe that, since it occurred off the premises, I do not believe that there is an issue with regard to workers' comp, though that is not an issue I necessarily explored, to be honest. Okay. All right. Well, that would be in the nature of a defense, I would assume, since this was 12b-6. Yes, Your Honor. It was not raised. Does your case depend upon whether Alicia was, quote, on the clock at the time of this Wisconsin trip and the murder, or is it just something that's helpful to you? I don't believe that our entire case depends on whether or not she was on the clock. I believe that she was told that if you go with me, you will be on the clock, and if you do not go with me, you're going to face consequences. You're going to be fired, your hours are going to be cut. Correct. So we've got supervisory abuse, authority being abused there. And she's going under the belief that she is going to be on the clock. I cannot tell you at this point whether or not there were things that were acquired after the fact that Cooper needed to do to ensure that things were amended correctly. I do not have the policies and procedures regarding the clocking in. I do know that it had to be done at a Home Depot premises, using a Home Depot phone by somebody there. But I do not know if there was any other procedure that would have required Brian Cooper to do something thereafter to ensure that she had been clocked in, which would not have been done by virtue of the fact that Alicia was dead and Brian Cooper was then taken into custody. And am I correct that she wasn't clocked in? No one clocked her in. Your Honor, at this point I do not have any proof one way or another, since we do not have discovery that she was or was not clocked in. I know that is a statement that was said in the respondent's brief. That is the first that I have heard of it. I have not been presented with any proof. I know there was an issue that was raised that we could look at her paycheck. Alicia was an adult with regard to her paycheck. We do not have paychecks that establish when it was she was on the clock, the hours that she was working at that time. These are things that we really need in order to be able to further flesh this out. But in terms of the clock, I mean, going back to Judge Hamilton's earlier question, if I understood you, it may fall more in the helpful rather than necessary box anyway. I mean, I'm thinking of Burlington Industries against Ellerth and City of Boca Raton against Farragher. Surely when a supervisor says to somebody, if you don't do X, then I'm going to make sure that you're fired or your hours will be cut, that falls in the tangible job consequence situation. And I'm not familiar with any cases in that line that draw a distinction between whether that's said in a phone call after hours to the house or in the workplace or on a Saturday when they run into each other accidentally in the shopping center or anything else. So I think the point is the relationship of supervisor to subordinate employee is what matters. I would agree with you 100%. Had Alicia not been working for Home Depot and Grand, under the authority of Brian Cooper, she would be alive today, and I submit that so would Baby Ava Lucille. Who issued her paychecks? A company named Vinca Solutions issued the paychecks. We initially sued Vinca Solutions in our first complaint, not having any discovery to be able to move forward and have more of a claim against Vinca. We believe that maybe they were just a third-party payee. Like paychecks? Yeah, for issuing. Just a company that handles payroll. That's what I believe to be the case, though I don't have all of the proof, so that is why we dismissed them after the initial set of briefs regarding the motion to dismiss. And because you didn't have discovery, you don't know whether it was Grand or Home Depot that had the relationship with this paycheck sort of company. That's correct. We operate under the assumption that Alicia was jointly employed by both Grand and Home Depot due to the fact that she wore a Home Depot uniform, she wore a Home Depot apron, their orange, the hat. She carried around Home Depot signs. She assisted Home Depot customers, and that is why we have alleged the joint employment relationship. Ms. Barnett, I'm concerned about the degree of detail that the district court seemed to expect in the complaint here. And you have actually an unusually detailed complaint, at least in my experience. But suppose one of Cooper's former supervisors, maybe Ms. Elwell or Ms. Clem, were to testify, if the case moved forward, that she knew of Cooper's violent incidents, she knew of the anger management training that was aborted, she knew about the complaints of prior sexual harassment by both Alicia and other women under his control, and she was terrified he was going to hurt someone. But based on her past experience, she was afraid that upper management would not back her up if she tried to do something about Mr. Cooper. If she were to testify that way, would that be consistent with the complaint? I believe that that would be consistent with our complaint, Your Honor. Ms. Elwell, I believe, was aware of what was going on. I do not know if she did, in fact, report up that there was an ongoing issue here or not. She had the opportunity to, at least according to the allegations. She had the opportunity to, and a corporation is not a person, but its knowledge is based upon the people that work for it. And in a position of supervisory authority such as Ms. Elwell and Ms. Clem and Mr. Hanno at Home Depot, there was sufficient notice to these employers, Home Depot and Grand, to do something. And had they done something prior to this going on, prior to him coercing her to go to Wisconsin, we would not be here today. So just to get your response on it, Home Depot argues, actually both of the defendants argue in their briefs, that maybe they knew this guy was a jerk, maybe they knew that he behaved inappropriately in the store, but they had no way of knowing that he was going to commit a brutal murder, an act of necrophilia. What's your response to that? They're trying to say, as I understand it, the causation chain gets broken because of the extremity of Mr. Cooper's behavior. Well, I think that this goes to, as far as foreseeability argument is concerned, Illinois law is clear that it's not necessary that the particular type of injury be foreseeable, just that a risk of harm or some danger be there. And when you have this ongoing conduct that is not getting better, that is not stopping, it's foreseeable that Alicia Bromfield was going to suffer some harm. She did not have the benefit, like Jessica Watts, a SEO, of quitting her job. She is almost seven months pregnant and needs to continue to work and save money in order to have this child. So while I understand that they're saying it's not foreseeable that she would be murdered or raped, that is not necessary. All it is is some harm or danger. And given his behavior, given his sexual harassment, given his abuse, throwing items, having to be forced off the premises because of his behavior, that does give rise. And taking the anger management, there's acknowledgment here. If there's a problem and he's sent for anger management, that's grand, acknowledging we have a problem. And Home Depot is throwing him off the premises because they see that there's a problem. And what about this sort of murky alluding to the fact that they had some sort of a dating situation? Where did all of that come from? Your Honor, I do not know where that came from. If we had the benefit of discovery, I believe that there are witnesses that would testify that that is absolutely not the case. I do not have that to put forward to you right now because we do not have the witness depositions. That is a convenient, I think, defense or some sort of a red herring being put out there by the responding defendants. Thank you. Ms. Barnett, you know that the defendants are telling us that the world will end if we allow liability in this case. I would be interested in your thoughts about the scope or the limits of the rule that you think we should predict the Illinois courts would adopt for cases like this. As far as, Your Honor, if you're discussing the magnitude of the burden in guarding against an injury such as this, I think that naturally Home Depot and Grand are going to complain and say the sky is falling. When in this case, one thing that Home Depot said was that this would impact thousands of employees who would have to be terminated or demoted. Well, if that is the case, then there is something. I mean, that was literally said. They did say that, something wrong in the state of Denmark. I am not making this up. But if that is the case, then there are problems much larger than this going on at Home Depot if thousands of employees would be infected by the demotion or the termination of people who have displayed this type of deplorable conduct. Okay, let me go back to my question. Sure, Judge. The question is that, look, we know there are going to be situations where human beings are going to mistreat each other. A lot of times relationships will have their origins in employment. And so I'm trying to get your sense of what you think is essential to your case. I think that it's not too much to ask employers to manage their employees responsibly and pay attention to reports of misconduct, especially when it's a person of... So reports of sexual harassment, they've got that. We've got a record of violent outbursts. And we even have prior unsuccessful efforts to manage that conduct. And we also have an individual who is taking female subordinates on road trips under the auspices of it being a work-related trip. And nobody seems to be paying attention to who's there, who's not. But this is not just a one-time occasion. This is something that happened with Jessica. This is something that happened with Alicia. There's a pattern here. So I do not believe that this would, as Home Depot suggests, impact thousands of its employees unless that it... Do you think that part of the problem here is who is really her employer? I mean, is Grand getting these complaints? Is Home Depot getting these complaints? I think that it was open and obvious to both companies. I think that both companies took affirmative steps as far as... Oh, Your Honors, I want to finish this. You should answer, Judge, and I'm going to give you a little more time. I will, of course, also give the employees a little more time. Thank you. I believe that I apologize. I just forgot my train of thought when I saw the red light. Your Honor, would you please repeat your question? Well, I mean, you know, there's a lot of finger-pointing. You know, who was hearing what? Who knew, you know, who knew more details? Who knew less details? Who... I think, ultimately, both of the employers have done things that show that they were both aware and both could take steps. Ultimately, Home Depot is in charge of who can be on their premises and who they have running their flower department, their garden department, and Grand would be responsible if they sent him for anger management, knowing that there was a problem, and thereafter failed to ensure that that had been managed. All right, I'm going to give you a minute for rebuttal, and as I said, I will adjust the appellee's time as well. Thank you. So thank you, and we'll hear... Are you Mr. Galloway? Yes, ma'am. Good morning, Your Honors. Ben Galloway on behalf of Home Depot. Mr. Busse and I have agreed to split our time today. We're trying to split it up by topic matter. I'd like to talk about the duty to protect individuals from the criminal actions of third parties. Well, Ms. Anchich says that under the Illinois Supreme Court decision in Simpkins, we don't need to find a special relationship between Ms. Bromfield and Grand and Home Depot so long as they contributed to the creation of a risk of harm to her. Would you care to respond to that? That's a terrible misreading of Simpkins. In fact, that court... But why is it since actually before you get to special relationships, the law of negligence itself imposes a duty on all of us to behave reasonably toward one another. A person who's driving a car who runs a stop sign has probably hit a third party that they don't know previously, but maybe we need to just start with the regular law of negligence. But in that example, Your Honor, that person that ran the stop sign created the danger. So let's talk then about the well-established law concerning tort liability of employers. Let's go to Section, say, 219 of the Restatement Second of Agency or Chapter 4 of the Third Restatement of Employment Law, both of which make quite clear that if a supervisory employee abuses authority in such a way as to commit a tort, the employer can be responsible for those torts. 2192D, a master is not subject to liability for the torts of his servants acting outside the scope of their employment unless the servant purported to act or to speak on behalf of the principal. I'm going to fire you or cut back your hours, and there was reliance upon apparent authority or he was aided in accomplishing the tort by the existence of the agency relation. Why doesn't that describe the allegations about this trip to Wisconsin? Well, first of all, Your Honor, those sections and those arguments are not relied upon at all by the plaintiffs in this case. Please respond to them substantively. Certainly. Your Honor, unfortunately a terrible thing happened in Wisconsin, but I think that it shows the person in the best position to know whether Cooper was a danger to her was the victim in this case. That's not true at all. Are you blaming her for going on that trip? I'm not. I'm simply pointing out, Your Honor, that when we talk about what's foreseeable. She's the employee. Her boss is telling her, I'm going to fire you if you don't come with me on this. The defense briefs describe this as a date. Now, maybe you can prove that as a fact, but I don't see how that's consistent with review of the 12B6 dismissal. I don't believe that term has ever been used. Would you like me to quote it? Not by our brief. Maybe it was in your colleague's briefs, but I wasn't aware you guys were trying to separate yourselves from one another in your legal theories here. Well, Your Honor, that is a fact that is alleged in the plaintiff's complaint, certainly, but it's something that basically. And we, of course, on 12B6, accept all facts and inferences in favor of the party opposing the motion. But that is a legal conclusion, Your Honors. That's a legal conclusion. A legal conclusion that her boss told her, if you don't come on this trip, I'm going to cut back your hours or fire you? How is that a legal conclusion? It's a legal conclusion of what she would have done. No, it's a statement of what was said to her. Was X said to you or Y said to you? It's just a statement about a conversation. Now, what we then infer from that conversation might begin to get you into some sort of mixed question of law and fact. But he either said it or he didn't. That's the kind of thing people testify about in court. You know, as you guys pointed out earlier during the plaintiff's oral argument, there is a question of who is the actual employer here. Did the district judge base his decision on that issue? I don't believe so. Has there been any exploration of the relevant facts? The district judge explored the facts that were alleged and found that this murder was unforeseeable as a matter of law. Right, and so he was not drawing a distinction between Home Depot and Grand. There is a well-understood theory of joint employment. Whether that pans out in the end, I certainly have nothing to say about because that's not before us and wasn't a factor that seems to have guided Judge Alonso at all. So I think that's just later. Let me go to this. I'm reading from Grand's brief here, and I'll ask you whether you agree with this. The complaint alleges that Cooper and Bromfield had a personal relationship and that Bromfield attended Cooper's sister's wedding as his date. Do you agree that that's a fair description of the allegations of the Wisconsin trip in the complaint? As his date, I think meaning accompanying him to. Oh, you know what the word date means. I mean, we're not going to be too fast. Let's not waste further time on that. Okay, Your Honors, again, this case is about whether there's a duty to protect from a criminal action. No, it isn't. It's about whether there's a duty to protect from essentially a battery, from some sort of physical attack. And personally, I don't think it would have made any difference if he had slapped her hard as a result of being angry over a rebuff of his proposal for more intimate relations or if he had raped her before he killed her or he killed her. There's the ability to foresee that there's going to be an assault, and then the rest of it's just damages. Well, I think Your Honor's question gets to whether foreseeability relates to the quality of a future action. So what the difference is is sort of is there an ability to foresee, say, a slap? Let's suppose, counsel, that your managers foresaw the likelihood of a slap by a supervisor. Do they have any obligation to step in that a supervisor is going to physically assault somebody he supervises? Is the plaintiff 250 miles away at a wedding? It doesn't matter. Please answer the question whether in the Home Depot. The point being the allegation of being in Door County could have been an allegation of being at the Chicago Club or it could have been an allegation of being anywhere else. The allegation is that he misused his supervisory authority that was given to him by the defendants in this case. So is your position that if they foresaw a lesser harm, they did or did not have an obligation to step in under the law, tort law? If they foresaw a lesser harm, there would be no obligation to step in at a social event that has nothing to do with work. But why is she there? I don't think that's a responsible answer. Who is she with? And why is she there? There would be no reasonable argument that anyone believed that they were at a work event. There are all sorts of work events. People go to Cubs games. There absolutely can be a reasonable argument to that effect because according to the allegations we mistreat as true, he said he would fire her if she didn't go. But there's no allegations that this is, in fact, a work event. Whether he's using his authority in an inappropriate manner is not the same as an allegation that this is, in fact, an event that is for work. It's defined as a work event by the allegation that it's a fireable offense. And as I was saying, there are work events where people go on Saturday afternoon to a Cubs game together. It's expected that you're going to go. You're told, you know, maybe you hate baseball. Maybe you don't happen to be a Cubs fan. That doesn't matter. It's a work event. And I just want you to, before you sit down, to comment. The Illinois Appellate Court in the Malorny case squarely says it is not essential that one should have foreseen the precise injury which resulted from the act or omission. And that's, you know, there's an objectively foreseeable risk of harm, and it doesn't matter if you didn't foresee the precise injury. Yeah, but we're talking about a difference of degree. No, no, that's exactly what they're saying isn't there. No one is putting this man in prison over this. He's already managed to do that for himself. This is a tort suit. It's a wrongful death claim, which is in the civil law side of things. Your Honor, it's simply not the case that you can, if you foresee, say, a slap, you can jump to an attack on the level of murder. Yes. We don't. We didn't. It's not alleged that he did. It's not alleged. But you're implying that if Home Depot saw him slapper and did nothing, then that would be okay. No, I'm not saying that at all. I'm saying that what matters is where the circumstances of the case. And I don't see that in the Illinois law. You're trying to make this geography, right? I'm not trying to make it just geography. It also matters that they hadn't been at work and that these circumstances don't arise from what happened at work. Do you know, for all intents and purposes, he may not be at work. She is at work because he said to her, if you don't come, you are fired. She is at work. Let me counsel ask you to look. I want to run something by you, and I hope the Grants lawyers will consider this as well. We've already talked a little bit about Ellerth and Farragher. I don't know how familiar you are with those cases, but in Ellerth and Farragher, the Supreme Court was dealing with employer liability for sexual harassment by supervisors. And the court drew upon general tort law applicable to employer responsibility for torts of their employees, including their supervisors. It drew on Section 219, which I quoted earlier from the Restatement Second of Agency, and now the dialogue as between sexual harassment law, which the kinds of cases this court sees a lot, and more general tort law has continued with the Restatement Third of Employment Law, which has actually adopted the Ellerth and Farragher affirmative defense as a way for dealing with issues of this kind of abuse of supervisory authority. It's in 4.03 of the Restatement Third of Employment. And it says, in essence, the employer is going to be responsible unless it can establish an affirmative defense of reasonable care to prevent and promptly correct actual and threatened abuse of authority and an employee unreasonably failed to take advantage of that process. That seems to me like where the law is moving in this field, and it frankly seems pretty sensible as if that's where the Illinois courts are probably going to go. Well, this case has been worked up as a duty-to-protect case, Your Honor, and that may be, but that's a decision, I think, for the Illinois Supreme Court to make, and they would have to overturn Oscar. How did we wind up in federal court here? The case was removed. So you asked for the federal forum, right? Yes, Your Honor. Okay. We're under Illinois law, however, and you may be right in that prediction, but they would have to overturn Iceberg. In Iceberg, the Illinois Supreme Court, there was an allegation that the defendants actually knew that the plaintiff was going to a threat was made, an actual threat that the plaintiff was going to be killed was made. And, in fact, this guy later shows up at the plaintiff's home and shoots him, and the plaintiff sues his business partners and says, hey, you didn't warn me. And the Illinois Supreme Court, when faced with this situation, upheld a dismissal of this count. But it all depends on where this duty-to-protect, you said this has been worked up as a duty-to-protect case. That's correct, Your Honor. That's how you've worked it up. But, of course, at a 12 v. 6 stage, there's no obligation to plead legal theories, number one. Any facts plausibly alleged that would lead to a right to relief can be addressed. Our review is de novo. And it's one of the earlier points we made. Before we get to all these special duties, there's a general duty of care in the employment relationship, as Judge Hamilton has pointed out, that Illinois has recognized forever. I'm not sure it requires adventurous interpretation on our part. Yeah, but the plaintiff isn't alleging in this case that the defendants created the danger. She is saying that they gave authority, using the 219 2D language, to Mr. Cooper, that facilitated his violent act toward her. Cooper had authority. It was never removed. They gave it to him, conferred by Home Depot, and in the face of all of her and or Grand, and in the face of all of the complaints from her and from her predecessor, they did nothing. They didn't reassign her. They didn't reassign him. They didn't fire him. They didn't take the ordinary actions that an employer would take. Well, yeah, the question is whether that presumes that there's some knowledge that he was They have plenty of knowledge on these allegations. Maybe you can, again, you know, trial, maybe you contest them, but these allegations are pretty There seems to be allegations of specific acts in terms of an inappropriate touching of Ms. Busseo. But also of violent acts. It's not too much to You think because he was only throwing things and he was shouting obscenities and he was stalking her and he was texting her and he was doing all of these things, that somehow that meant that it was not foreseeable that there would be, even so much as a slap, as a violent act, and I think that doesn't give the complaint the deference it's due under 12B-6. Well, I think that we live in kind of the real world where people, you know, handle frustration differently. Oh, well. Is that what you think was going on here? I think that Mr. I'm not here to defend Cooper's actions. I'm not here to say that Cooper was a great guy and shouldn't have, you know, that's not what I'm here to do. What I am here to do is say that there's a qualitative difference between what is alleged in the complaint and an attack on a person that could wind up with murder and rape. Those are different in quality. And to say that they're the same is a huge leap. In your view, who would have had to fire him? In my view, it would have been Grant. I mean, we're dealing with the allegations of the complaint, so I don't want to get into arguing. I'm trying desperately. Sure. We understand. Sure. And I think maybe I'm going to let you wrap up now because I believe that we certainly have the essence of your argument. Okay. Thank you, Your Honor. Based on the fact that there can be no duty to protect from a third-party criminal action in these circumstances, we'd ask that you uphold the opinion of the trial court. Thank you. Okay. Thank you very much. Mr. Busse? Good morning, Your Honor. William Busse on behalf of the Grand Entities. I am probably stepping out of landmine here because my presentation this morning was supposed to be on the issue of foreseeability, which has been fairly well covered by my colleague. Ms. Sanchez's reply says that Grand knew that Mr. Cooper used his authority to coerce Ms. Bromfield into taking trips with him and sharing a motel room with him, and that's in the reply. But if Grand did know that he was abusing his authority in this way, then does that knowledge support the imposition of some duty to Ms. Bromfield outside of the actual four corners of the Home Depot store? The answer would be yes, if it was done in the context of something that was work-related. But I would hasten to add, Your Honor, that if we are confining ourselves to the allegations and the pleadings themselves, Grand never knew that they were doing anything because they had both engaged in this clocking-in scheme that was outlined in the plaintiff's complaint. But if Grand knew, if any employer knows that a supervisor with a history of sexual harassment is using his authority to coerce young women into taking trips with him, isn't it really obliged to remove that authority from him? Yes, they are. And there were complaints about Jessica. There was the time that he said, we're going to go pick up a bunch of other people, and instead he essentially falsely imprisons her, drives her to downtown Chicago against her will. She complains. She tells people about it. She quits. She quits, yeah. You know, in the law of sexual harassment anyway, it's not really for the victim to quit. It's for the employer to purge the sexual harassment from its workplace. Well, that was one point that I wanted to raise, Your Honor, because there has been so much made about this alleged sexual harassment that was going on. You don't think sexual harassment was going on? I don't know one way or the other, Your Honor. From the allegations of the complaint, you don't think? The only time that I accept those as true is for proceedings like this. Well, you have to accept that's what we're doing right now. Nothing, I mean, I should just reassure everybody, nothing that's being said in this courtroom, should there be further proceedings in this case, binds anybody. You know, you have to have discovery. You have to have perhaps trials. You know, we all understand that. To answer the question directly, I don't know. I can tell you that Rand didn't know. So when you read that complaint, you don't see a plausible, to use the Supreme Court's Twombly-Iqbal word, a plausible account of sexual harassment on the part of Mr. Cooper toward subordinate young female employees. They're not recovering for sexual harassment. I know they aren't. I'm just saying there are a lot of facts in the complaint. This wasn't a case brought under Title VII. I understand that. It's a tort case. It's a wrongful death case. But I'm just, you said something a minute ago that you didn't even think this was sexual harassment, which startled me, that's all. I didn't say that I didn't think it was sexual harassment. I said I didn't know what was going on. If all of this is true. You know, Ms. Sanchez's reply brief emphasizes that according to the complaint, it was known that he's clocking in female employees when they're traveling with him. And, I mean, if that clocking in was wrongful, shouldn't, you know, Grant and or Home Depot have removed his ability to do that? But that was the whole point of the clocking in scheme, so that Grant wouldn't know that they were together. I think that's a sidelight, actually, the clocking in scheme. I think the focus really, I mean, first of all, it's alleged, so we have to assume it happened. But the focus has to be the allegation that she's told that if, biased by her supervisor, Mr. Cooper, that if you don't come with me, you're going to be fired. In other words, I'm defining this event as a work-related event. And as Judge Rovner said, that made it a work-related event for her. And it is by no means unknown for places of employment to have outside social events that are pretty much mandatory events to go to. So I don't think that there's a problem with work-related. I understand what you're arguing about foreseeability. I understand that at some point down the line, somebody's going to have to figure out who's the employer, whether maybe they're both the employers. But these are allegations of open and notorious acts of abuse against women. Do you know who was paying, do you know who was paying? Issued the paychecks? Yeah, was telling the company that issued the paychecks to issue the paycheck. That would have been grand, my understanding, well, specifically grand services. My understanding is that technically she was employed by VINCA. It was a temporary service. Her paychecks came from VINCA, and we paid VINCA for her services. She was a seasonal employee. Yeah. Mr. Busey, can I go back to a question that came up earlier? You describe in your brief, you say that the plaintiff's claim fails to address why Bromfield was with Cooper at a private function in Wisconsin. If Cooper was so dangerous that his employers, who were located in Michigan, should have known of the danger to Bromfield, why didn't Bromfield, who worked with Cooper on a daily basis, know of that danger? And I would direct your attention to paragraphs 50 and 51 of the amended complaint. Thereafter, Cooper told Alicia that he would reduce her work hours and or fire her from her job if she did not go to her sister's wedding with him. And thus, Cooper coerced Alicia not to go to work on Friday, August 18th, but instead to accompany him to the wedding, which was to take place in Door County, Wisconsin. I would think that those allegations answer your question. May or may not be proved, but do you think they answer your question? Well, the event itself was not work-related. There's no doubt about that. This was the wedding of Cooper's sister that he talked her into going to. That doesn't really respond to my question. Let me try it again. Your brief says the complaint at page 17 alleges that Cooper and Bromfield had a personal relationship and that Bromfield attended Cooper's sister's wedding as his date. Do you think that is a fair characterization of the allegations of the amended complaint? Well, again, I believe that that came from the trial transcript, and Cooper referred to him as her date, his date. You're referring to his testimony in the criminal trial? That he said that she was his date. Okay. For our purposes, we're talking about the allegations in the civil complaint, which are that Cooper told Alicia that he would reduce her work hours and or fire her from her job if she did not go to his sister's wedding with him. Does that sound to you like a date? No, it doesn't sound like a date. Thank you. But one thing I would like to say. What does it sound like? He certainly shouldn't have couched it in those terms. That would have been inappropriate behavior, certainly. But this is one of the things that I wanted to tell the bench. This is not a case about sex. It's just not. It's a wrongful death case. It's a case about power. It's a case about power in the employment relationship. And sometimes that results in sex, and in this case, it resulted horribly in a death. Two deaths. Two deaths, yes. Tell me why that's an incorrect way to perceive this case. Because in the context of what the plaintiff is presenting right now, and this goes back to the reasonable foreseeability argument, what we knew that was reasonably foreseeable, taking the allegations of the complaint as true, that if we knew that the two of them were together, Cooper was going to make some inappropriate remarks to her. He would have referred to her as his girlfriend. He may have rubbed himself against her. Well, according to the complaint, that's what we knew that he did. But to jump from the conclusion of this guy behaves inappropriately sexually with coworkers or other women to, yeah, he's probably going to kill her. That's reasonably foreseeable. It's a seismic leap of logic. Let me ask you, in your brief, you say, page 16, even if Cooper's attack was reasonably foreseeable, I know you say it, but even if it was reasonably foreseeable, the burden of guarding against the harm is so great that no duty of care arose. Do you really mean that, that an employer who foresees such an attack has no duty to intervene? The problem comes in the policing of it, and two, I don't know that that would have prevented the situation, Your Honor. That doesn't answer Judge Hamilton's question. Are you standing by what you said in that brief, that if you know, reasonably foresee these things happening, I understand, don't worry, we know that that's not your position, but if that were your position, if it were the case that this was reasonably foreseeable, you don't think employers could handle the burden of protecting against it? How about just firing him? Then he's not your employee anymore. Well, all that does, Your Honor, is it gets the grand entities off the hook. It doesn't stop the conduct. I'm sorry, I didn't hear you. Well, we understand that, but he says it just gets grand off the hook. It doesn't solve the Mr. Cooper problem, which is certainly true. But we are in a very defined space here, and we are looking at, it also would have meant that if he said, come to my sister's wedding with me, she could have said no in safety because her job wouldn't have been on the line. Well, one of the problems that we have is we're caught between the real world and the legal world. If, in fact, Grant was aware of that, yes, he would have been either the least demoted and probably fired. But based on these allegations in retrospect, it's hard to say, yes, we should have fired him because, in reality, Grant didn't know about this. Okay. All right. Thank you. So thank you very much. Thank you, Your Honor. And, Ms. Barnett, I'll give you three minutes to rebut since we did, in fact, give people more time. Thank you, Your Honor. I'm not sure that I will need that time. In summary, I'd like to say that the district court got it wrong. The harm to Alicia was foreseeable based on all the facts that you've read and the allegations of the complaint. You don't mean the harm, do you? You mean a harm. A harm. A harm or danger, Judge, as we've discussed and as you've stated. The exact crime or harm does not need to be predetermined or foreseen. But we've gone over all of the allegations. I think that we've discussed all these things. And if you have no further questions, I wanted to sincerely thank you on behalf of my client for this opportunity and pray that you reverse the court's dismissal. Thank you. All right. Thank you very much. Thanks to all counsel. We will take this case under advisement.